856 F.2d 196
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Garrett R. SMITH, Plaintiff-Appellant,
v.
E & L TRANSPORT COMPANY, Defendant-Appellee.
 No. 87-3339.
 United States Court of Appeals, Sixth Circuit.
 Sept. 8, 1988.
 
 Before MILBURN and BOGGS, Circuit Judges and CONTIE, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 Garrett R. Smith appeals from the district court's March 6, 1987 judgment in favor of E & L Transport Company and against Smith on his discrimination claims brought pursuant to the Age Discrimination in Employment Act (ADEA) and the Ohio Revised Code. For the following reasons, we affirm the district court's judgment.
 
 I.
 
 2
 In January of 1951, appellant Garrett Smith began working for appellee E & L Transport Company. E & L is a wholly-owned subsidiary of TRANSCO which delivers automobiles principally for Ford Motor Company.
 
 
 3
 Smith's first position with E & L was as a driver, hauling automobiles from E & L's terminal in Dearborn, Michigan. During his thirty-year tenure with E & L, Smith held a variety of positions, including supervisory positions, at several terminals in Kentucky, Ohio, and Michigan.
 
 
 4
 Smith testified that on February 28, 1981, while working as operations manager at E & L's Cincinnati, Ohio terminal he was told that he was laid off indefinitely. Thereafter, on April 3, 1981, E & L sent a letter to appellant informing him that he was being placed on temporary layoff because of a decline in business. After being informed of his layoff, appellant moved his wife to Middlesboro, Kentucky. He remained in Ohio for three weeks, and then he joined his wife.
 
 
 5
 On July 14, 1981, Smith filed a charge with the Equal Employment Opportunity Commission (EEOC) against E & L, alleging age discrimination. The Ohio Civil Rights Commission refused to accept jurisdiction over the charge. On March 11, 1983, after receiving a notice of right to sue, appellant filed a complaint in state court, alleging violations of the ADEA and state discrimination laws. E & L removed this case to the United States District Court for the Southern District of Ohio on March 31, 1983.
 
 
 6
 In July of 1983, after the commencement of this action, E & L offered Smith a position as operations supervisor of the Cincinnati terminal. Because Smith had obtained other employment and because of his wife's poor health, Smith rejected this offer.
 
 
 7
 On January 12, 1987, appellant's ADEA claim went to jury trial. The jury was unable to reach a verdict, and upon agreement of the parties, one juror was dismissed, and the court declared a mistrial. A second trial commenced on February 9, 1987, and resulted in a jury verdict for appellee. After a bench trial, the district court issued an opinion and order, ordering judgment in favor of E & L on appellant's state law claims on March 6, 1987. On that same day, the district court entered judgment in favor of E & L consistent with the jury verdict and its opinion and order.
 
 
 8
 This timely appeal followed. Each of the issues presented to this court relates to the ADEA claim or to the conduct of appellees in general. We are asked to decide the following questions: (1) whether the district court erroneously instructed the jury nter alia that "if there is no company policy to transfer laid off employees from one facility to another, the company may hire whomever should apply;" (2) whether the district court erroneously entered judgment for appellee in accordance with the jury verdict in light of the evidence; and (3) whether the district court abused its discretion in failing to grant sanctions against appellee.
 
 II.
 A.
 
 9
 The district court gave the following jury instruction:
 
 
 10
 The law does not require an employer to lay off or terminate a younger employee holding any job for which plaintiff was qualified. Nor is the failure to do so evidence of pretextual reasons for Plaintiff's layoff or termination. The law is not a guarantee of continued employment to those over forty. It merely prohibits employers from using age as a determining factor to disadvantage employers (sic) in the protected class. Further, if there is no company policy to transfer laid off employees from one facility to another, the company may hire whomever should apply.
 
 
 11
 Appellant objected to this instruction on the ground that there had been testimony that the company had a policy, although not in writing, that if a person was laid off "they looked around, and if they could use them they'd replace them."
 
 
 12
 Appellant argues that the instruction which stated that the appellee could hire whomever should apply removes from the jury the question of whether the hiring of those persons under the age of forty while Smith was laid off was evidence of age discrimination. Appellant also argues that this instruction implies that no duty exists to transfer employees who are laid off in the absence of a formal policy and that the failure to do so is not evidence of age discrimination. Appellee argues that the law applied by the district court in its instructions was clearly correct, particularly in light of the disputed fact question concerning the existence and extent of any transfer policy. We agree with appellee.
 
 
 13
 "The function of the reviewing court with respect to instructions is to satisfy itself that the instructions show no tendency to confuse or mislead the jury with respect to the applicable principles of law. It will be presumed that the jury followed the instructions correctly as they were given. In determining whether the charge is erroneous, it must be considered as a whole." 9 C. Wright & A. Miller, Federal Practice and Procedure Sec. 2558 p. 668 (1971).
 
 
 14
 In Ridenour v. Lawson Co., 791 F.2d 52, 57 (6th Cir.1986), this court stated that "[w]here an employer reduces his workforce for economic reasons, it incurs no duty to transfer an employee to another position within the company." In Ridenour, "Lawsons' uniformly applied policy of not demoting executives to subordinate positions was held to be a legitimate, non-discriminatory reason for refusing to offer Ridenour a subordinate position." Id. Subsequently, in Simpson v. Midland-Ross Corp., 823 F.2d 937, 942 n. 6 (6th Cir.1987), this court reiterated that "[w]hen an employer reduces its work force for economic reasons, it incurs no duty to transfer the employee to another position within the company." In that case, "Simpson admitted that there was nothing in his relationship with Midland-Ross that would have obligated Midland-Ross to transfer him to another position." Id.
 
 
 15
 More recently, in Lewis v. Sears, Roebuck & Co., (in re Lewis ), 845 F.2d 624, 632-33 (6th Cir.1988), this court held that under the following circumstances, a reasonable jury could have found that Sears discriminated against the plaintiff on the basis of race when it chose to fire instead of transfer her:
 
 
 16
 In addition to proffering evidence that similarly-situated white employees were transferred to other departments instead of being fired, Lewis tendered ample proof to contradict Sears' efforts to explain why those employees were differently situated from Lewis. For example, Sears explained its firing of Lewis by stating that its policy with respect to sub-par salespersons was modified during the time in question to permit firing of these employees, rather than transferring them to other departments. Yet plaintiff adduced evidence that the alleged policy, if it existed, was entirely oral and was applied inconsistently in practice. Moreover, testimony concerning the existence of the policy was impeached at trial.
 
 
 17
 Further, Sears urged at trial that the reasons for the transfers of Ms. Rock and Mr. Kalivoda were because the former, after recuperating from an illness, asked to be reinstated to her no-longer vacant position, and the latter was deficient only in selling maintenance agreements, not big ticket items themselves. Yet, plaintiff offered evidence that the personnel department assured Rock that she would be reinstated to her old position, and that Sears has no written policy with respect to maintenance agreement performance. Additional examples: Sears contended that employees were transferred for reasons other than poor performance, but evidence revealed that poor performance actually may have been the reason for the transfers. Sears argued that full-time and part-time employees were not treated similarly and were not compared to one another, yet, evidence on the other side showed that all such employees were evaluated by the same criteria. Thus, taken as a whole, we find that a reasonable jury could have found that Sears discriminated against Lewis on the basis of race when it chose to fire her.
 
 
 18
 Lewis was fired for poor work performance rather than for economic reasons. However, because Sears arguably had a policy of transferring employees with poor performance records prior to terminating them, the jury's verdict for the plaintiff was not overturned by this court on appeal.
 
 
 19
 In the instant case, appellant characterized certain of his moves during his employment with E & L occurring in the context of terminal openings or closings as transfers. Appellant testified, however, that E & L never had a written transfer policy of which he was aware. Several witnesses testified that there was no transfer policy at E & L. Robert Aubertin, E & L's general manager, testified as follows:
 
 
 20
 Q. Was there any policy on transfer of salaried personnel or offering them another position in case of a layoff?
 
 
 21
 A. No formal policy. no.
 
 
 22
 Q. Was there an informal policy?
 
 
 23
 A. No each case was looked at on its own merits.
 
 
 24
 Q. So, it was something that was made up as the situation came up?
 
 
 25
 A. Right.
 
 
 26
 Omer Boatman, a terminal manager, testified that he had never heard of or seen a policy or procedure on layoffs or transfers of salaried personnel in his time at E & L. Vice president of operations Richard Meisel testified that the company had no policy regarding transfers or layoffs in 1980. Larry Murray, personnel director at E & L, testified that there was no written policy regarding layoffs or transfers of salaried personnel.
 
 
 27
 However, Donald Hayden, president of E & L, indicated that the company would consider requests for transfer to a new location if it could accommodate the request. Hayden further testified that the company had transferred some of its long time employees to different positions rather than laying them off. Additionally, on cross-examination Murray testified as follows:
 
 
 28
 Q. Now you were here also, were you not, when Mr. Hayden's testimony was read?
 
 
 29
 A. Yes, I was.
 
 
 30
 Q. You remember him testifying it was the company's policy in the case of a layoff of a supervisory personnel to find a position if the company needed that person. Do you remember testifying to that?
 
 
 31
 MR. HOLLINGSWORTH. Objection, Your Honor, referring to the testimony or (sic) other witnesses--
 
 
 32
 THE COURT. Well, sustained.
 
 
 33
 Q. Wasn't it a fact that there was a company policy if a supervisor was laid off to attempt to find him another place within the company?
 
 
 34
 MR. HOLLINGSWORTH. Objection, repetition.
 
 
 35
 THE COURT. He may answer.
 
 
 36
 A. If the company could and there was any possibility they would try.
 
 
 37
 Q. That was the company policy?
 
 
 38
 A. Yes.
 
 
 39
 Q. And that was true in 1981?
 
 
 40
 A. Yes.
 
 
 41
 Thus, the existence and extent of a company policy regarding transfers was a disputed fact. In this situation, the district court properly left the resolution of this fact question to the jury when it instructed that "if there is no company policy to transfer laid off employees from one facility to another, the company may hire whomever should apply." (Emphasis added). Additionally, this instruction is in accord with the law in this circuit. Ridenour and Simpson hold that the ADEA imposes no duty on the employer to transfer a protected employee to another position within the company rather than to terminate employment. Lewis implicitly holds, however, that a duty to transfer rather than terminate can result from even an informal company policy to transfer rather than terminate employment.
 
 
 42
 The jury instructions taken as a whole would not confuse or mislead the jury with respect to the applicable principles of law. Appellant's arguments to the contrary are based on a misconstruction of the charge. First, appellant argues that this instruction removes from the jury the question of whether the hiring of those persons under the age of forty while Smith was laid off was evidence of age discrimination. Appellant fails to recognize that the challenged instruction at issue is prefaced with the phrase "if there is no company policy to transfer laid off employees from one facility to another." Furthermore, the district court instructed that the ADEA prohibits employers from using age as a determining factor to disadvantage employees in the protected class. Thus, the jury would conclude that if there was a company policy to transfer laid off employees from one facility to another, this policy would have to be applied to employees in the protected class as well as to nonprotected employees. Second, appellant argues that this instruction implies that no duty exists to transfer employees who are laid off in lieu of a formal policy and that the failure to do so is not evidence of age discrimination. The instruction makes no reference to the need for a formal policy. Indeed, since there was no evidence of a formal transfer policy, if one were required in order to infer age discrimination, the district court would have been correct in refusing to give the instruction. Instead, it gave the instruction without reference to a formal policy because it recognized that none was needed.[1]
 
 B.
 
 43
 "The court of appeals will not pass on the sufficiency of the evidence supporting a judgment, where the appellant did not move in the trial court for a directed verdict nor for a judgment notwithstanding the verdict, except to the extent that it will determine if there was a complete absence of evidence to support the verdict, without regard to sufficiency, or if there was any plain error resulting in a manifest miscarriage of justice." 5A J. Moore, Moore's Federal Practice p 50.12 pp. 50-90 (1988). See Coffy v. Multi-County Narcotics Bureau, 600 F.2d 570, 576 (6th Cir.1979). One treatise also states that courts of appeals will not review the sufficiency of the evidence if the district court has denied a motion for a directed verdict that does not comply with Federal Rule of Civil Procedure 50(a)'s requirement that a motion for a directed verdict state the specific grounds therefor. 9 C. Wright & A. Miller, Federal Practice and Procedure p 2536 p. 593 (1971). Cf. Clark v. Central States Dredging Co., 430 F.2d 63, 65 (8th Cir.1970) (stating that where the district court was uninformed of any specific ground for the motion for directed verdict until after judgment had been entered, the denial of the motion for that reason does not constitute error, but reviewing the sufficiency of the evidence anyway). However, in Hageman v. Signal L.P. Gas, Inc., 486 F.2d 479, 482 (6th Cir.1973), this court considered a motion for directed verdict which did not state specific grounds for its request as required by Rule 50(a) as a general motion for verdict in the appellant's favor on appeal. In that case, the court reviewed the sufficiency of the evidence.
 
 
 44
 In the instant case, after appellee renewed his motion for directed verdict at the conclusion of the evidence, appellant added, "I will make the same ones." Then appellant stated, "I don't know that I have made one. I have not been that sure of myself." The court announced, "I will overrule motions at this time." The fact that the district court overruled appellant's motion, as evidenced by his use of the plural "motions," indicates that a motion for a directed verdict, although not a specific one, was made by appellant. Under Hageman, this court will consider appellant's motion for a directed verdict as a general motion for a directed verdict.[2] Therefore, although appellee urges us to do otherwise, we will review the sufficiency of the evidence.
 
 
 45
 This court reviews the denial of a directed verdict by the district court under the same standard used by that court in determining whether or not it was appropriate to grant the motion. 9 C. Wright & A. Miller, supra at Sec. 2536 p. 595. See Sawchik v. E.I. DuPont Denemours & Co., 783 F.2d 635, 636 (6th Cir.1986) (citations omitted).
 
 
 46
 In considering a motion for a directed verdict under Rule 50(a), the trial court 'must determine whether there was sufficient evidence presented to raise a material issue of fact for the jury.' As applied in this context, 'sufficient evidence' is such that, when viewed in the light of those inferences most favorable to the nonmovant, there is either a complete absence of proof on the issues or no controverted issues of fact upon which reasonable men could differ.
 
 
 47
 In the instant case, appellant argues that there is insufficient evidence that appellee's legitimate nondiscriminatory reason, i.e., economic necessity, was not pretextual. Appellee argues that appellant's evidence that economic necessity is a pretextual reason is based entirely on challenges to the credibility of the inferences to be drawn from the evidence presented. We agree with appellee.
 
 
 48
 For example, on cross-examination Thomas O'Meara admitted that the company experienced a forty-five percent increase in gross revenues from the year 1980 to 1981. O'Meara explained, however, that while there was an increase in revenue, the company had a serious cash flow problem from the expansion of the facility at Woodhaven. O'Meara explained further as follows:
 
 
 49
 The facility was built at a time when the interest rate was not real high. And as I indicated to you, it was set up that Ford Motor Company was going to pay for the facility, and they were going to do that by means of so much per vehicle passing through the gate, so to speak. We handled a hundred thousand cars, so much a unit, that would equate to the debt service. What had happened is the interest rate went considerably higher. Consequently, we were being strangled by the fact that the debt service on the borrowing of the funds was very, very high, and the unit rate that we were getting for the cars coming through the gate was set when the interest rate was lower. Consequently, we were funding then that facility, that differential in the debt service. And Ford Motor Company came in, in 1981 and reviewed our situation and effectively was making a decision whether to keep us in business or not. That's the real economic necessity.
 
 
 50
 On redirect, O'Meara indicated that Ford increased the purchase rate per vehicle coming to the facility so that the company would no longer have a cash drain. O'Meara did not indicate when Ford took this action.
 
 
 51
 Additionally, O'Meara testified that the Cincinnati terminal consistently lost money from 1979 through 1982. He testified further that the number of vehicles shipped at Cincinnati decreased annually from 1980 through 1982. O'Meara testified that the average number of drivers for the company in Cincinnati was twenty-one in 1980, seventeen in 1981, fifteen in 1982, and eighteen in 1983. Appellant argues that the evidence of poor financial health in Cincinnati is of little weight because he worked for the company as a whole not simply for the Cincinnati terminal, and that since he was willing to transfer the reasons for the layoff given by appellee were just "smoke and mirrors."
 
 
 52
 When viewed in the light most favorable to E & L, there was sufficient evidence presented to raise a material issue of fact for the jury concerning the ultimate question of fact in this case, i.e., whether E & L discriminated against appellant. Therefore, directed verdict for appellant would have been inappropriate in the instant case.
 
 C.
 
 53
 Federal Rule of Civil Procedure 37(b) provides in relevant part as follows:
 
 
 54
 If a party or an officer, director, or managing agent of a party or a person designated under Rule 30(b)(6) or 31(a) to testify on behalf of a party fails to obey an order to provide or permit discovery, including an order made under subdivision (a) of this rule or Rule 35, or if a party fails to obey an order entered under Rule 26(f), the court in which the action is pending may make such orders in regard to the failure as are just, and among others the following:
 
 
 55
 * * *
 
 
 56
 * * *
 
 
 57
 An order striking out pleadings or parts thereof, or staying further proceedings until the order is obeyed, or dismissing the action or proceeding or any part thereof, or rendering a judgment by default against the disobedient party[.]
 
 
 58
 This court reviews a district court's grant or denial of sanctions pursuant to Rule 37 for abuse of discretion. Regional Refuse Sys., Inc. v. Inland Reclamation Co., 842 F.2d 150, 154 (6th Cir.1988). " 'Dismissal of an action for failure to cooperate in discovery is a sanction of last resort that may be imposed only if the court concludes that a party's failure to cooperate in discovery is due to willfulness, bad faith, or fault.' " Id. at 153-54 (quoting Patton v. Aerojet Ordnance Co., 765 F.2d 604, 607 (6th Cir.1985) (citations omitted)). Additionally the sanction of dismissal is generally imposed only for egregious misconduct, such as repeated failure to appear for deposition. Id. at 155.
 
 
 59
 Appellant argues that the district court abused its discretion in refusing to grant the drastic sanction of default judgment. The record before this court contains no evidence of willful, egregious misconduct on appellee's part. Clearly, the district court committed no abuse of discretion in refusing to impose such a drastic sanction in the instant case.
 
 
 60
 For the foregoing reasons, the district court's judgment is AFFIRMED.
 
 
 
 [1]
 For the first time, in his reply brief appellant argues as follows: "Appellant never asserted that there was a binding company policy to transfer employees from one facility to another. Appellant has asserted though that, with respect to him at least, there was a company practice to transfer him from one facility to another." Appellant does not explain the difference between an informal policy and a practice. Additionally, appellant did not tender a "practice" instruction, and objected to the instruction given only on the ground that there had been testimony that the company had a policy, although not in writing, that if a person was laid off "they looked around, and if they could use them they'd replace them." Thus, the ground pressed in appellant's reply brief was never raised in the district court in compliance with Federal Rule of Civil Procedure 51
 
 
 [2]
 In Rochester Civic Theatre, Inc. v. Ramsay, 368 F.2d 748, 752 (8th Cir.1966), cited in Hageman, 486 F.2d at 482, the Eighth Circuit explained that a general motion for a directed verdict can only go to the case in its entirety and not to independent issues or counts